IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES DIVISION/IBT, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 10 C 7425 |
| | ) ) | Judge Virginia M. Kendall |
| NORFOLK SOUTHERN RAILWAY COMPANY, | ) ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

A dispute has arisen between the Plaintiff, Brotherhood of Maintenance of Way Employees Division/IBT ("BMWED"), and the Defendant, Norfolk Southern Railway Company, under the Railway Labor Act, 45 U.S.C. § 151 *et seq.* regarding the collective bargaining agreements between them. BMWED is a union that represents Norfolk Southern Railway employees who serve in the maintenance of way craft. At issue is whether the Railway has the right under these agreements to use reports from third-party expert witnesses at the on-property disciplinary hearings it conducts concerning possible misconduct by BMWED-represented employees without having given notice or copies of such reports to the union in advance of the hearings and without bringing the experts to the hearings or otherwise making them available for questioning by the union. The union alleges that the carrier has violated the rights of its members under the existing collective

bargaining agreements, which provide that union-represented employees may only be disciplined after a "fair and impartial investigation."

The union contends that the Railway's practices are neither fair nor impartial and that they violate its members' rights to "contractual due process," and in so doing violate Section 2 First of the Railway Labor Act, 45 U.S.C. § 152 First, which obligates a carrier to maintain agreements with the unions representing its employees. The Union asserts that this Court has the authority to declare the Railway in violation of the RLA and to permanently enjoin it from undertaking certain practices that it finds objectionable. Specifically, the Union objects to the lack of pre-hearing discovery and disclosure by the Railway and to the use of hearsay reports and statements, including expert reports, at the on-property disciplinary hearings it conducts.

The Railway contends that this is a minor dispute within the meaning of the RLA, 45 U.S.C. § 153 First (I), and that therefore it is subject to the exclusive and binding arbitral jurisdiction of the National Railroad Adjustment Board pursuant to Section 3 of the RLA, 45 U.S.C. § 153, or to exclusive and binding arbitration before adjustment Boards established by the carrier and the union pursuant to Section 3 Second of the RLA, 45 U.S.C. § 153 Second. Both parties moved for summary judgment. Norfolk Souther Railway is entitled to judgment as a matter of law for the reasons stated herein and therefore its Motion for Summary Judgment is granted.

## I. The Undisputed Material Facts

The undisputed material facts submitted by the union are all supported solely by the Affidavit of Steven V. Powers, an Assistant to the President of the union.[1]  Although Powers' affidavit states that he supervises all matters that appear before RLA arbitration boards, he fails to present any facts that show that he has personal knowledge of each of the hearings he is testifying regarding as required by Federal Rule of Civil Procedure 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").  *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008) ("The evidence supporting a factual assertion must represent admissible evidence.").  Such testimony by Powers would be based on inadmissible hearsay in violation of Federal Rules of Evidence 801 and 802 or would violate Federal Rule of Evidence 1002.  *See Id*.  Furthermore, the factual assertions made by the union in paragraphs 3, 8 and17 are not relevant  to any of the claims or defenses of the parties in this case.  The statements of fact contained in paragraphs 20, 21, 22, 23 and 24 constitute statements of opinion and arguments, not statements of fact, contrary to Local Rule 56(a)(3).  *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2 ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts.

---

[1]This is true with respect to every factual assertion aside from paragraph 1, which describes the parties, and paragraph 2, which is the jurisdictional and venue statement.

We have held that a district court has broad discretion to require strict compliance with Local Rule 56.1.") (internal citations omitted); *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (a party's statement of material facts submitted pursuant to Local Rule 56.1 is improper where it fails to cite to the record and is "filled with irrelevant information, legal arguments, and conjecture."). The purpose of Local Rule 56.1 statements of facts is to identify the relevant admissible evidence supporting the material facts that each party contends require either the granting or the denial of summary judgment. *See Markham v. White*, 172 F.3d 486, 490 (7th Cir. 1999) (the local rules governing summary judgment "assist the court by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence.").

In addition, the union's Statement of Additional Facts That Require the Denial of Summary Judgment are taken verbatim from unsupported assertions in Powers's Supplemental Affidavit. They are nothing more than argumentative and conclusory assertions. Under Local Rule 56.1 it is improper for a litigant to include legal or factual conclusions, arguments, or conjecture in a statement of material facts or in a statement of additional material facts. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060. Furthermore, none of the additional statements of fact show that Powers has personal knowledge of, or is competent to testify to, these facts and therefore do not set out facts that would be admissible in evidence as required by Federal Rule of Civil Procedure

56(c)(4). Because the Union's Statement of Additional Facts is improperly argumentative and conclusory and not supported by admissible evidence it is fails to rebut the statements made by the Railway. *See Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527-529 (7th Cir. 2000) (upholding the district court's decision to strike a statement of facts in its entirety, rather than selectively, as a punishment for failing to comply with the local rules governing summary judgment by submitting facts that consisted of improper legal arguments).

The Railway is a "carrier" within the meaning of the Railway Labor Act (hereafter "the RLA"), 45 U.S.C. § 151 First. (BMWED 56.1 Resp. ¶ 1).[2] NSR employees in the

---

[2]The parties submitted to this Court their Local Rule 56.1(a)(3) Statements of Material Facts in Support of Summary Judgment. The Brotherhood of Maintenance of Way Employes Division's L.R. 56.1(a) response to Norfolk Southern Railway Company's L.R. 56.1(a)(3) Statement of Material Facts is abbreviated here as "BMWED 56.1 Resp ¶ _." Norfolk Southern Railway Company's L.R. 56.1(a) response to the Brotherhood of Maintenance of Way Employes Division's LR 56.1(a)(3) Statement of Material Facts is abbreviated here as "NSR 56.1 Resp. ¶ _." The Brotherhood of Maintenance of Way Employes Division submitted a Statement of Additional Facts That Require the Denial of Summary Judgment pursuant to Local Rule 56.1(b)(3)(C). Norfolk Southern Railway Company's response to those additional facts is abbreviated here as "NSR Add'l 56.1 Resp. ¶ _." Norfolk Southern Railway Company did not submit a separate Statement of Additional Facts That Require the Denial of Summary Judgment pursuant to Local Rule 56.1(b)(3)(C). Nevertheless, the Brotherhood of Maintenance of Way Employes Division responded to certain statements submitted in Norfolk Southern Railway's 56.1(a) response to the Brotherhood of Maintenance of Way Employes Division's L.R. 56.1(a)(3) Statement of Material Facts in Support of Summary Judgment as if they were additional facts submitted pursuant to L.R. 56.1(b)(3)(C). The Brotherhood of Maintenance of Way Employes Division's response to Norfolk Southern Railway's "additional material" is stricken as improper. The Court will independently ensure that Norfolk Southern Railway's submission does not contain arguments or facts that go beyond the scope of a proper L.R. 56.1(a) response. Norfolk Southern Railway chose to forgo submitting additional facts pursuant to L.R. 56.1(b)(3)(C); the Brotherhood of Maintenance of Way Employes Division may not isolate portions of Norfolk Southern's response to its L.R. 56.1(a)(3) Statement of Material Facts in Support of Summary

maintenance of way craft are represented by the Brotherhood of Maintenance of Way EMPLOYEES Division/International Brotherhood of Teamsters. (*Id.* ¶ 2). BMWED is a "representative" of these NSR employees within the meaning of the RLA, 45 U.S.C. § 151 Sixth. (*Id.*). NSR and BMWED are parties to various collective bargaining agreements that set forth the wages, hours, working conditions, and other terms and conditions of employment of BMWED-represented NSR employees. (*Id.*).

In 2001, NSR and BMWED entered into a System Discipline Rule (hereafter "SDR"), which amended Rule 30 of the collective bargaining agreement between BMWED and an NSR predecessor, the Norfolk and Western Railway Company, which is applicable to the former Norfolk and Western Railway Company territories on the NSR system. (*Id.* ¶ 6). The SDR also amended Rule 40 of the collective bargaining agreement between BMWED and another NSR predecessor, the Southern Railway Company, which applies on the former Southern Railway Company properties. (*Id.*). The SDR provides that "an employee who has been in service more than sixty (60) calendar days shall not be disciplined or dismissed, nor will an unfavorable mark be placed upon their record without a fair and impartial investigation." (*Id.* ¶ 7).[3] A BMWED-represented employee who is under

_____

Judgment to attack as what it independently perceives to be additional facts.

[3]BMWED disputes this characterization of the SDR. BMWED's dispute consists largely of improper argument and conjecture. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2 ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts. We have held that a district court has broad discretion to require strict compliance with Local Rule 56.1.") (internal citations omitted); *Cady*, 467 F.3d at 1060 (a party's statement of material facts

investigation by NSR must be given not less than ten days' advance notice of the investigation hearing setting forth the precise charges against the employee under investigation. (*Id.*). A written transcript of statements taken at the investigation hearing must be made and provided to BMWED. (*Id.*). The employee may be represented at the investigation hearing by a duly authorized BMWED official. (*Id.*). The SDR provides that an employee may appeal from an adverse disciplinary decision, initially to the highest designated NSR officer. (*Id.*). If the matter cannot be resolved at an initial appeal to the highest designated NSR officer, the SDR provides that an appeal may be taken to "a special board of adjustments" that "shall be established with jurisdiction over such disputes involving disciplinary matters resulting in dismissal, suspension or reprimand to provide expedited resolution of such disputes." (*Id.*).

Over the years NSR and BMWED have established several special Boards of adjustment (hereafter "SBAs") under RLA Section 3 Second (second para.), 45 U.S.C. § 153 Second (second para.), to issue final and binding arbitration awards resolving disputes arising from employee discipline. (*Id.* ¶ 8). For many years, Dennis L. Kerby, formerly

---

submitted pursuant to Local Rule 56.1 is improper where it fails to cite to the record and is "filled with irrelevant information, legal arguments, and conjecture."). Furthermore, the record evidence that BMWED cites as support for its argument, the Supplemental Affidavit of Steven V. Powers, does not show that Powers has personal knowledge of, or is competent to testify to, these facts and therefore does not set out facts that would be admissible in evidence as required by Rule 56(c)(4) of the Federal Rules of Civil Procedure. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 ("The evidence supporting a factual assertion must represent admissible evidence."). The evidence submitted by NSR, the SDR and the Declaration of Dennis L. Kerby, adequately substantiates NSR's factual assertion.

Assistant Director of Labor Relations and Director Labor Relations and now Assistant Vice President Labor Relations, has served as the Carrier Member of these Boards. (*Id.*).

The NSR-BMWED SDR does not contain any requirement that either NSR or the union notify the other in advance of a disciplinary investigation hearing when that party intends to introduce written statements from third parties or reports from experts at the hearing. (*Id.* ¶ 9).[4] Nor does it contain any requirement that such written statements or expert reports be provided in advance of the hearing. (*Id.*). The SDR does not provide for any pre-hearing discovery. (*Id.*). Nor are any such requirements set forth in any other collective bargaining agreements between NSR and BMWED. (*Id.*). The NSR-BMWED SDR does not prescribe any rules concerning the nature, type, or form of evidence that may be submitted by either party or received into evidence by the hearing officer at a disciplinary investigation hearing. (*Id.* ¶ 10). In particular, the SDR does not prohibit the submission or receipt of hearsay evidence. (*Id.*). Nor does the SDR require that evidence may be received only from witnesses who are present at the hearing and who can be subjected to questioning. (*Id.*). Nor are any such requirements set forth in any other collective bargaining agreements between NSR and BMWED. (*Id.*).

---

[4]BMWED asserts that while the CBA is silent on this issue these rights are implied in the CBA as a matter of contractual due process and through the RLA's guarantee of due process and fair and impartial hearings. BMWED does not cite any record evidence in support of its contention; it is pure argument and conjecture. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060; *Alberio*, 246 F.3d at 933. The evidence submitted by NSR, the SDR and the Declaration of Dennis L. Kerby, adequately substantiates NSR's factual assertion.

On several occasions NSR has retained Richard T. Hughes, P.E., a consulting engineer, to prepare accident reconstruction reports that it has submitted as evidence in disciplinary investigation hearings for certain maintenance of way employees, including A.D. Gibson, Steven Kawa, W. L. Orr, and D. A. Glista, all of whom were represented by BMWED. (*Id.* ¶ 11).[5]  Hughes has not appeared either in person or by telephone at any of these hearings. (*Id.*).  The hearing officers at these hearings have noted for the record any objections BMWED or its members have made to NSR's consideration of the Hughes reports. (*Id.*).  Since the BMWED-NSR SDR entitles neither NSR nor BMWED to advance notice of witnesses, NSR has not provided such advance notice or copies of the Hughes reports to BMWED in these cases.  (*Id.*).

On January 29, 2009, NSR conducted an investigation hearing to determine whether BMWED-represented employee A.D. Gibson had made false and conflicting statements concerning how he had sustained an alleged on-duty injury on October 16, 2008.  (*Id.* ¶ 12).  At the on-property hearing, NSR introduced a written report from Hughes in which Hughes concluded that the injury could not have happened as Gibson had reported.  (*Id.*).

---

[5]BMWED attempts to dispute this fact.  Its dispute is improper argument and conjecture.  *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060.  Furthermore, the record evidence that BMWED cites as support for its argument, the Supplemental Affidavit of Steven V. Powers, does not show that Powers has personal knowledge of, or is competent to testify to, these facts and therefore does not set out facts that would be admissible in evidence as required by Rule 56(c)(4) of the Federal Rules of Civil Procedure.  *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382.  The evidence submitted by NSR, the Declaration of Dennis L. Kerby, adequately substantiates NSR's factual assertion.

Following the hearing, NSR dismissed Gibson from service and BMWED filed an appeal. (*Id*. ¶ 13). In its written submission to SBA No. 1049, BMWED expressly objected to the receipt of the Hughes report into evidence at the investigation hearing, arguing, "The problem here is that although the accuracy of the test report was challenged during the investigation, Mr. Hughes was not available for cross examination. This fact was duly noted and objected to during the investigation." (*Id*.). In its Award No. 193 SBA No. 1049 upheld Gibson's dismissal. (*Id*. ¶ 14). In particular, the SBA approved NSR's decision to credit the Hughes report in making its disciplinary decision, stating:

> We further defer to the decision on the property to credit the consulting engineer's forensic report. Although the Organization questioned some of the assumptions made by the consulting engineer, such as the assumption that the Claimant did not report any pain or discomfort on the day of the incident, we find the overall conclusion and several key bases for that conclusion, such as the absence of damage to the hard hat and the inconsistency between a blow to the hard hat and the diagnosis of cervical strain, to be unrefuted. We conclude that Carrier proved the charge by substantial evidence. (*Id*.).[6]

On July 6, 2009, Steven Kawa reported that he had sustained an injury while driving an NSR gang truck along Interstate 94 near Ypsilanti, Michigan. (*Id*. ¶ 15). On July 20, 2009, NSR Assistant Division Engineer M. J. Difilippantonio sent Kawa a letter summoning him to an investigation hearing, to be conducted pursuant to the SDR on July 31, 2009, "to

---

[6]BMWED attempts to discredit this SBA Award and the approval of Hughes by the Board. Its dispute is improper argument and conjecture. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060. The evidence that NSR supplies as support for this fact, the Declaration of Dennis L. Kerby and its Exhibit 4, adequately substantiates this fact.

determine your responsibility, if any, in connection with making false statements regarding your alleged incident and claim of injury to your back, neck, and head on July 6, 2009." (*Id*.). The investigation hearing was conducted by Assistant Division Engineer David A. Griffith. (*Id.* ¶ 16).[7] Kawa attended the hearing, represented by his union representative Jack David, Vice Chairman, Affiliated Systems Federation. (*Id*.). Among the exhibits introduced by NSR at the investigation hearing was a written report prepared by Hughes. (*Id*.). The Hughes report set forth the results of tests Hughes had conducted based on his re-creation of the incident that allegedly injured Kawa. (*Id*.). Based on these tests, Hughes concluded that the likelihood that Kawa had suffered the injury he had reported was "extremely remote." (*Id*.). Hughes was not present at the hearing. (*Id*.). Following the hearing, NSR dismissed Kawa from its employment. (*Id*.).

On August 31, 2009, David sent a letter to A.J. Licate, NSR's Director Labor Relations, appealing NSR's decision to dismiss Kawa pursuant to the appellate procedure

---

[7]BMWED attempts to dispute what it calls NRS "antiseptic version of the Kawa investigation." Its dispute is improper argument and conjecture. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060. Furthermore, the record evidence that BMWED cites as support for its argument, the Supplemental Affidavit of Steven V. Powers, does not show that Powers has personal knowledge of, or is competent to testify to, these facts and therefore does not set out facts that would be admissible in evidence as required by Rule 56(c)(4) of the Federal Rules of Civil Procedure. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382. The evidence that NSR supplies as support for this fact, the Declaration of Dennis L. Kerby, adequately substantiates this fact.

in the SDR. (*Id.* ¶ 17).[8]  In the appeal letter, David did not contend that NSR's introduction of the Hughes Report at the investigation hearing violated the SDR or otherwise object to its receipt by the hearing officer into evidence. (*Id.*).  David did not object to the fact that NSR had not given BMWED notice in advance of the hearing that it would introduce the report.  David did note that Hughes had not been present at the hearing and had not been available for questioning, but he did not argue that as a result the receipt of the Hughes report into evidence violated the SDR. (*Id.*).  David merely asserted, "Since Mr. Hughes was not available for the Organization to question at the hearing, I can only assume that this exhibit 'G' [the Hughes report] will not have any bearing on the outcome of this investigation." (*Id.*).  With the appeal letter, David included a written statement of August 28, 2009 by Tony Machetta, Service Manager of Old Dominion Truck Leasing. (*Id.*).  The statement concerned the purpose of tether straps on air seats. (*Id.*).  BMWED did not notify NSR that it would be submitting such a statement in advance of sending the appeal letter, nor did BMWED proffer Machetta for questioning by NSR. (*Id.*).

---

[8]BMWED attempts to dispute the fact that the letter was not written like one by an attorney, and argues that NSR did not perform the duty required of it under the Act to undertake a fair and impartial effort to settle all disputes, including in the internal appeals process.  Its dispute is improper argument and conjecture.  *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060. Furthermore, the record evidence that BMWED cites as support for its argument, the Supplemental Affidavit of Steven V. Powers, does not show that Powers has personal knowledge of, or is competent to testify to, these facts and therefore does not set out facts that would be admissible in evidence as required by Rule 56(c)(4) of the Federal Rules of Civil Procedure.  *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382.  The evidence that NSR supplies as support for this fact, the Declaration of Dennis L. Kerby and its Exhibit 8, adequately substantiates this fact.

On September 24, 2009, Kerby denied BMWED's appeal in the Kawa matter in a letter he sent to BMWED General Chairman T.R. McCoy, Jr. over the signature of Licate. (*Id.* ¶ 18). Because David did not allege in his appeal letter that submission or receipt of the Hughes report violated the SDR, Kerby did not address that subject in his letter denying Kawa's appeal. (*Id.*). On December 15, 2009, in accordance with the appellate procedures of the SDR, Kerby participated in a conference with David at which the Kawa appeal was discussed. (*Id.* ¶ 19). The parties were unable to resolve the dispute during the conference, so they agreed to submit the Kawa appeal to SBA No. 1048 for a final and binding arbitral decision. (*Id.*).

In accordance with standard practice and Section 6 of the SBA, both NSR and BMWED filled written submissions with SBA No. 1048, setting forth their respective positions on the Kawa matter. (*Id.* ¶ 20).[9] In its submission to the SBA, BMWED argued, "It is submitted that the Carrier has not presented a single shred of evidence, much less clear and convincing evidence, that Claimant Kawa gave any false information in connection with the incident or his injury." (*Id.* ¶ 23). BMWED argued in its appeal to SBA

---

[9]BMWED asserts that NSR should have known that the CBA was violated by the use of the Hughes report. BMWED's dispute is improper argument and conjecture. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060. Furthermore, the record evidence that BMWED cites as support for its argument, the Supplemental Affidavit of Steven V. Powers, does not show that Powers has personal knowledge of, or is competent to testify to, these facts and therefore does not set out facts that would be admissible in evidence as required by Rule 56(c)(4) of the Federal Rules of Civil Procedure. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382. The evidence that NSR supplies as support for this fact, the Declaration of Dennis L. Kerby and its Exhibit 10, adequately substantiates this fact.

No. 1048 that the Hughes Report was "meaningless in this dispute" and should be given no weight for several reasons relating to alleged deficiencies in the way Hughes had conducted the re-enactment of the incident. (*Id*.). However, BMWED did not argue that NSR had violated Kawa's right to a fair and impartial investigation under the SDR by failing to provide BMWED with a copy of the Hughes report prior to, or by submitting it at, the investigation hearing or that the NSR hearing officer had violated Kawa's rights under the SDR by receiving the report into evidence. (*Id*.).

On February 25, 2010, SBA No. 1048 met in Chicago for a hearing to discuss the issues in the Kawa appeal. (*Id*. ¶ 21). Kerby participated in that hearing as the Carrier Member of the Board. (*Id*.).[10] BMWED's Public Law Board Coordinator, T.W. Kreke, participated as the Employee Member. (*Id*.). Richard K. Hanft participated as the Chairman and the Neutral Member of the Board. (*Id*.). On May 10, 2010, Hanft issued his proposed Award (SBA No. 1048, Award No. 185) in the Kawa matter, which became final under Section 11 of the SBA when it was signed by the other members of the Board on June 18, 2010. (*Id*. ¶ 22). The Board ruled, "We conclude that the finding on the property that Claimant made a false statement concerning an on-duty injury is supported by substantial

---

[10]BMWED asserts that NSR's factual submission is true except for the omission that Kerby never revealed to the Neutral Member of the Board or to BMWED what he knew about the Hughes evidence and his role in shaping the charges. BMWED's assertion is pure argument and conjecture and is supported by nothing in the record. An unsupported factual assertion is inadequate. *See Albiero*, 246 F.3d at 933. The evidence that NSR supplies as support for this fact, the Declaration of Dennis L. Kerby, adequately substantiates this fact.

evidence." (*Id.*). The Board upheld the punishment of dismissal, stating, "falsifying a claim of an on-duty injury is a very serious offense that generally warrants dismissal. In the record presented, we cannot say that the penalty assessed was arbitrary, capricious or excessive. Thus, the claim is denied." (*Id.*). Because BMWED had not argued in its submission to SBA No. 1048 that NSR's failure to provide it with a copy of the Hughes report, or NSR's submission of the report at the investigation hearing, or the receipt of the report by the hearing officer had violated Kawa's rights under the SDR or otherwise, the Award did not address these issues. (*Id.* ¶ 23).

On August 26, 2010, three and a half months after the Kawa Award became final, BMWED's Board member submitted a Dissent to Award No. 185. (*Id.* ¶ 24). In this dissent, BMWED argued for the first time that the Hughes report "was a travesty of both procedural and substantive due process." (*Id.*). In particular, BMWED argued for the first time:

> Finally, the junk science opinion paper submitted by the so-called expert was presented at the hearing as naked hearsay. That is, over the vociferous objection of the Union, the hearing officer allowed the Carrier to enter the opinion paper into the record even though its author was not present for cross-examination as to his credentials or methodology. And, to make matters worse, the Carrier failed to even inform the Union of the existence of the opinion paper, much less provide a copy, in advance of the hearing. This was a blatant case of prosecution by ambush and any fair reading of the transcript establishes that the Claimant did not receive a fair and impartial investigation. (*Id.*)

On September 21, 2010, Kerby responded to the Dissent to Award No. 185. (*Id.* ¶ 25). In

particular he responded to BMWED's assertion that NSR had deprived Kawa of a fair and

impartial hearing with respect to the Hughes report. (*Id*.). Kerby wrote:

> The Dissent's discouraging remarks regarding the allowing into the record
> or giving any consideration to the testimony of the reenactment or the expert
> witness submission is contrary to the accepted standards. Hearing Officers
> typically allow all reasonable efforts to establish the facts—such material is
> accepted into the record and afforded whatever weight is appropriate based
> on the character and reliability of the information. The reenactment, while
> not necessarily definitive standing on its own, was of some relevance with
> respect to the possibility of the incident occurring as alleged, just as were
> details regarding the type of seat in the Gang Truck, whether it had been
> properly installed, its position and whether the Claimant wore his seatbelt.
> The expert witness submission was merely a documentation of all these
> details. The Board did not accept that information in a vacuum; rather it
> weighed that evidence along with all of the other, including the eye-witness
> statement that the Claimant's head did not hit the ceiling of the truck versus
> the Claimant's report that he "jammed" his head against the ceiling. (*Id*.).

In a companion case to this one, *Brotherhood of Maintenance of Way Employees

Division/IBT v. Norfolk Southern Railway*, No. 10 C 7545 (Kendall, J.), the union petitioned

this Court to vacate and set aside the arbitration Award in the Kawa case based on

allegations that NSR had committed fraud in connection with the Kawa appeal.[11] BMWED

---

[11]The Court *sua sponte* takes judicial notice of the facts of the companion case as it is entitled to do pursuant to Federal Rule of Evidence 201, as the case is a matter within the public record and therefore not subject to reasonable dispute and can be accurately and readily be determined from sources whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201(b)(2); *see also* Fed. R. Evid. 201(c)(1) (the Court may take judicial notice on its own initiative). Furthermore, caselaw establishes that courts may take judicial notice of public court documents. *See Henson v. CSC Credit Services*, 29 F.3d 280, 284 (7th Cir. 1994). In addition, the companion case is before this very Court—and this Court is entitled to take notice of its ruling in that case. Furthermore, the Court may take judicial notice of adjudicative facts "at any stage of the proceeding." Fed. R. Evid. 201(d).

alleges that Kerby committed fraud by not disclosing to the other members of the SBA evaluating Kawa's appeal that the Hughes report was allegedly false or misleading or that Kerby was allegedly derelict in performing an affirmative obligation to undertake an investigation of Hughes's credentials and methodologies. Consistent with the narrow standard of judicial review prescribed by the Act for RLA arbitration Board decisions and in accordance with binding Supreme Court precedents, and lacking any evidence whatsoever from BMWED establishing that Kerby committed any acts of fraud in connection with the Kawa appeal, this Court granted Norfolk Southern Railway's motion for summary judgment and held that the arbitration Award was entitled to deference by the Court. Therefore the Award stands as decided by the SBA. Thus, the Kawa appeal has not only been resolved by RLA arbitrators against the claims of the union as is required by the Act, it has also been examined by an independent federal court and the Award has been upheld against the union's claims that NSR committed fraud in connection with the Kawa matter. The union's efforts to have the Award vacated and set aside proved fruitless, and now the Kawa matter has been fully resolved to a complete and final decision resulting in the termination of Kawa for his alleged misconduct.

On May 10, 2010, BMWED-represented NSR employees William Orr and Donald Glista were involved in a traffic accident while driving an NSR welding truck. (*Id.* ¶ 26). NSR managers who investigated the accident concluded that Orr and Glista may have

made false and conflicting statements concerning whether they had sustained injuries as a result of the collision and the nature and extent of such injuries. (*Id*.). Accordingly, on May 25, 2010, the employees were summoned to a disciplinary investigation hearing to determine their responsibility, if any, in connection with:

> conduct unbecoming an employee concerning false and conflicting statements in that on May 17, 2010, following NS Welding Truck 704625 being slid into by private vehicles at approximately 1:10 PM, at the intersection of State St. and Irvine Ave. in Sharon City, PA, you reported to the Police that you experienced minor pain in the Shoulder from the seat belts. However, you subsequently told NS Supervisors that you did not sustain any injury from this vehicle incident, but, upon arrival of Supervisor Eshenbaugh you requested medical attention and ultimately alleged to have been injured in the vehicle incident. (*Id*.).

The investigation hearing was held on June 11, 2010. (*Id*. ¶ 27). At the hearing, NSR introduced a report from Hughes reconstructing the accident. (*Id*.). Hughes concluded, based on his analysis, "that the driver of the Norfolk Southern truck (Orr) as well as his passenger (Glista) sustained no seatbelt, head/neck shoulder injuries due to this accident. In fact, the impact for their vehicle which weighed 25,360 pounds vs. the 3,500 pound van and the 4,000 pound truck was insignificant." (*Id*.). At the conclusion of the hearing, T. J. Nemeth, BMWED's First Vice Chairman, who represented the employees at the hearing, objected that "[a]ny documentation that was provided here today by the Carrier, should be not allowed as inadmissible evidence because this Organization wasn't privy to that—that documentation prior to this investigation, which failed to give due process for

Mr. Orr and Mr. Glista." (*Id*.). Following the hearing, both Orr and Glista were dismissed from NSR service. (*Id*. ¶ 28). BMWED has appealed their dismissals. (*Id*.). In his July 9, 2010 appeal letter to Kerby, Nemeth argued, "The report given by Mr. Merilli on Pages 71 through 74 from a Mr. Richard T. Hughes can only be considered as speculation on his part as he or Mr. Merilli was not present at this investigation scene on the day in question. Furthermore, Mr. Hughes was not present at this investigation for Mr. Glista, Mr. Orr or me to cross-examine. Thus, due process was not afforded to the accused employees." (*Id*.). BMWED's appeals from the dismissals of Orr and Glista were discussed with NSR in conference, but no agreement was reached. (*Id*. ¶ 29). To date, BMWED has not yet submitted these cases to an RLA arbitration board. (*Id*.).

NSR and its predecessor railroads and BMWED and its predecessor unions repeatedly have presented expert reports and other written witness statements at investigation hearings without providing copies of such reports and statements to the other party in advance of the hearings and without bringing the authors of those reports or statements to the hearings, where they could be subjected to questioning by the party opposite. (*Id*. ¶ 30). For example, NSR's predecessor, Norfolk and Western Railway Company, and BMWED each presented written drug testing reports at the investigation hearing involving BMWED member John Smith. (Id.). No one from either testing laboratory was present at the hearing. (*Id*.). Norfolk and Western Railway Company

discharged Smith based on the evidence submitted at the hearing. (*Id.*). Following Smith's dismissal, BMWED submitted a sworn statement from an expert physician on Smith's behalf as part of the union's appeal. (*Id.*). The physician, Dr. Harold L. Klawans, was not made available for questioning by NSR. (*Id.*). Smith's discharge was upheld by Public Law Board No. 3530, Award No. 81. (*Id.*).[12]

Similarly, both Norfolk and Western Railway Company and BMWED submitted written drug testing reports without presenting live testimony at the on-property investigation hearings concerning employees D.L. Bush and M.S. Queensberry. (*Id.* ¶ 31). Each was dismissed after testing positive for marijuana. (*Id.*). BMWED once again submitted sworn testimony from Dr. Klawans with its appeal in each case. (*Id.*). Norfolk and Western Railway Company's dismissal of Bush was upheld by Public Law Board No. 3530, Award No. 87. (*Id.*). Its dismissal of Queensberry was upheld by Public Law Board No. 3530, Award No. 88. (*Id.*). NSR's predecessor, Southern Railway Company, presented a written report from a forensic document examiner at the investigation hearing of BMWED-represented employee J.D. Parker without having the expert present for questioning. (*Id.* ¶ 32). The carrier's dismissal of Parker was upheld by Public Law Board No. 3445, despite BMWED's assertion that Parker had not received a fair and impartial

---

[12]RLA arbitration Boards are sometimes referred to as "Public Law Boards." Public Law Boards are equivalent in all respects to the NRAB and the term is interchangeable with Special Boards of Adjustment ("SBAs").

hearing. (*Id.*). BMWED itself also has submitted written expert reports at disciplinary investigation hearings without giving NSR advance notice or copies of the reports and without bringing the witness to the hearing for questioning. (*Id.* ¶ 33). NSR undertook an investigation of BMWED-represented employee Alfonso Gonzalez for failing to timely report an on-duty injury, as required by NSR rules. (*Id.*). At the investigation hearing, BMWED presented a letter from a physician, Dr. Matthew F. Gornet, opining that "[i]t is not unusual for an individual doing heavy labor to feel a twinge in his neck or low back, or experience some minor discomfort to those areas while performing his job with very minimal symptoms [and then to] develop gradually escalating symptoms related to his neck and low back." (*Id.*). BMWED did not bring Dr. Gornet to the hearing where he could be questioned by NSR representatives. (*Id.*).

NSR has presented written reports from accident reconstruction experts in investigation hearings involving members of other unions that represent its employees without presenting the experts for questioning. (*Id.* ¶ 34). For example, NSR presented a written report from an accident reconstruction expert at the investigation hearing for M.E. Quick, an employee represented by the Brotherhood of Railroad Signalmen. (*Id.*). Rule 701 of the collective bargaining agreement between NSR and the Brotherhood of Railroad Signalmen, like the SDR between NSR and BMWED, provides that "[a]n employee who has been in the service of this Company more than sixty (60) days will not be disciplined or

held out of service without first being given a fair and impartial formal investigation." (*Id.*). In its Award No. 68 Public Law Board No. 5622 upheld the discipline, finding that "Claimant received a fair and extremely extensive hearing." (*Id.*). Similarly, in the disciplinary investigation hearing of O.G. Garcia, a locomotive engineer represented by the Brotherhood of Locomotive Engineers, NSR presented a written report from a consultant retained to determine the cause of a derailment but did not bring the consultant to the hearing. (*Id.* ¶ 35). The NSR-Brotherhood of Locomotive Engineers collective bargaining agreement, like the NSR-BMWED SDR, requires NSR to provide a "fair and impartial hearing." (*Id.*). Following the hearing, Garcia was dismissed from service. (*Id.*). Public Law Board No. 7057 affirmed the discipline in its Award No. 10. (*Id.*).

The unions that represent other crafts and classes of NSR employees have also presented written expert witness reports at disciplinary investigation hearings without bringing the authors of those reports to the hearings for questioning and without having given NSR advance notice that such evidence would be presented or pre-hearing discovery of such reports. (*Id.* ¶ 36). For example, NSR conducted a disciplinary investigation hearing on September 9, 2010 concerning possible misconduct by employee G. Ratledge, a member of the Brotherhood Railway Carmen, Division of TCU. (*Id.* ¶ 37). Ratledge was charged with failing to properly and timely report an injury and falsifying a report of an injury to his neck. (*Id.*). Rule 29 of the NSR-Brotherhood Railway Carmen, Division of

22

TCU collective bargaining agreement, like the SDR between NSR and BMWED, states that "[a]n employee who has been in the service of the Carrier for 60 working days shall not be discharged, suspended or otherwise disciplined without a fair and impartial investigation." (*Id.*). At the hearing, the union submitted, and the hearing officer received into evidence, a written affidavit from Dr. Tyler A. Kress, a safety and biomedical engineering expert, who opined that "Mr. Ratledge's description of the incident [that allegedly caused his injury] is absolutely plausible." (*Id.*). Dr. Kress was not present at the hearing for questioning by NSR. (*Id.*). The union did not give NSR advance notice that it would be submitting an affidavit from him at the hearing or a pre-hearing copy of the affidavit. (*Id.*). At the hearing the union also submitted, and the hearing officer received into evidence, three written reports from the Center for Sports Medicine & Orthopaedics, Ratledge's treating physicians. (Id.). None of these physicians were present at the hearing for questioning by NSR, and the union did not give NSR advance notice that it would be submitting these reports at the hearing or copies of the reports prior to the hearing. (*Id.*).

RLA arbitration boards have repeatedly ruled that there is no right to "discovery" prior to disciplinary investigation hearings in the absence of a contractual provision granting such right. (*Id.* ¶ 38). There have been numerous awards so holding in cases involving NSR and its predecessor railroads. (*Id.* ¶ 39). *See, e.g., United Transp. Union and Norfolk Southern Ry.*, Pub. Law Bd. No. 6602, Award No. 7, pg. 2 (2004) ("Numerous

tribunals in this industry have long held that there is no right to discovery in railroad discipline cases. . .If either party wished to obtain the right to discovery at the pre-investigation stage, the appropriate forum would be the bargaining table, not arbitration. This Board is powerless to give either party something that is not contained in their collective bargaining agreement."); *Bro. Loco. Eng'rs and Norfolk Southern Ry.*, SBA No. 1063, Award No. 560, pg. 2 (2003) ("The words 'fair and impartial trial' have not been construed, by implication or explication, to incorporate any of the pre-trial discovery procedures which might be available in Court proceedings."); *Int'l Bro. Elec. Workers and Norfolk Southern Ry.*, Pub. Law Bd. No. 6034, Award No. 7, pg. 3 (1999) ("[W]e have pointed to no provision of the Collective Bargaining Agreement requiring the discovery process. Further, Constitutional due process rights do not apply to industrial type investigations such as is here involved."); *Int'l Assn. of Machinists & Aerospace Workers and Norfolk Southern Ry.*, Pub. Law Bd. No. 5710, Award No. 7, pg. 2 (1995) ("It is well established that railroad discipline does not, absent a specific contractual provision, allow for discovery."). (*Id.*).

Arbitrators have similarly ruled in cases involving BMWED and other carriers whose employees it represents. (*Id.* ¶ 40). *See, e.g., Bro. Maint. Way EMPLOYEES and Union Pacific R.R.*, NRAB Third Div., Award No. 35305, pg. 3 (2001) ("[I]t is well-established that there is neither a right to advance discovery in these proceedings nor is there any prohibition against introduction of witness statements that have not previously been

produced to the Organization."); *Bro. Maint. Way EMPLOYEES and Burlington N. R.R.*, NRAB Third Div., Award No. 32488, pg. 3 (1998) ("[T]here is ample precedent that the failure of the Carrier to provide documents requested by the Organization prior to the Investigation is not a fatal error as there is no contractual or legal obligations on the Carrier to do so."); *Bro. Maint. Way EMPLOYEES and CSX Transp., Inc.*, NRAB Third Div., Award No. 32384, pg. 3 (1997) ("We have reviewed the record carefully, but we find no citation to an Agreement provision for discovery. We find no precedential provision for the type of discovery sought by the Organization here."). (*Id.*).

BMWED has recently attempted through the collective bargaining process to amend the NSR-BMWED SDR to provide for pre-hearing discovery. (*Id.* ¶ 41).[13] On December 9, 2009, the Rail Labor Bargaining Coalition (hereafter the "RLBC"), which consists of six international unions including BMWED, sent notice under Section 6 of the RLA, 45 U.S.C. § 156, to the National Carriers Conference Committee (hereafter the" NCCC"), the multi-employer bargaining association representing the nation's major freight railroads including NSR, of proposed changes in existing rates of pay, rules and working conditions. (*Id.*). Attached to the December 9, 2009 letter as Exhibit D was a notice of specific changes sought

_____

[13]BMWED attempts to dispute this fact and tries to characterize the RLBC and NCCC negotiations. In particular, BMWED tires to minimize the attention paid to the demand that included pre-hearing discovery. Its assertion is pure argument and conjecture. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060. The evidence that NSR supplies as support for this fact, the Declaration of Dennis L. Kerby, adequately substantiates this fact.

by BMWED.  (*Id*.).  BMWED's specific bargaining demands included, "Establish[ing] a rule that provides for pre-hearing discovery of evidence to be presented against a charged employee."  (*Id*.).  When the RLBC and the NCCC were unable to reach an agreement on any of the proposed changes, President Obama issued an Executive Order on October 6, 2011 establishing a Presidential Emergency Board pursuant to RLA Section 10, 45 U.S.C. § 160, to investigate the dispute and make recommendations with respect to changes to existing collective bargaining agreements.  (*Id*.).  On November 5, 2011, the Presidential Emergency Board issued its Report to the President.  (*Id*.).  The Presidential Emergency Board did not recommend that BMWED's proposal concerning pre-hearing discovery be adopted or that existing collective bargaining agreements, including the NSR-BMWED SDR, be changed in this respect.  (*Id*.).  On February 2, 2012, an agreement was reached (ratification pending) between BMWED and the NCCC on behalf of its member railroads, including NSR, on changes to existing collective bargaining agreements.  (*Id*.).  BMWED's proposal for pre-hearing discovery was not included in that tentative agreement.  (*Id*.).

RLA arbitration boards have repeatedly ruled in decisions going back decades that hearsay evidence may be submitted and received in on-the-property disciplinary investigation hearings in the rail industry, including in cases involving BMWED and NSR and its predecessors.  (*Id.* ¶ 42).  For example, in *Bro. Maint. of Way EMPLOYEES and Union Pacific R.R.*, NRAB Third Div., Award No. 35305, pg. 4 (2001), the Board rejected objections

raised by BMWED to written statements submitted by the carrier at the on-property hearing. (*Id.* ¶ 43). The Board stated, "As far as the admissibility of hearsay evidence contained in written statements introduced by the Carrier at the Hearing, such evidence was properly admitted, considered, and weighted. The hearsay nature of the written statements goes to probative weight, not admissibility." (*Id.*). Similarly, in *Bro. Maint. of Way EMPLOYEES and Southern Pacific Transp. Co.*, Pub. Law. Bd. No 1795, Award No. 3, pg. 3 (1976), the Board rejected BMWED's objection to hearsay evidence presented by the carrier at the investigation hearing. (*Id.* ¶ 44). The Board ruled, "As to the contention that 'hearsay testimony' was permitted, it has been held repeatedly that hearsay testimony is admissible, provided it is fairly received and properly evaluated in light of all the evidence. (See for example 1st Div. Awards 17158, 22294 and 3rd Div. Award 7062, among others)." (*Id.*).

Nothing in the NSR-BMWED SDR prohibits the submission or receipt of hearsay evidence in disciplinary investigation hearings. (*Id.* ¶ 45). Under identical circumstances, the Third Division of the NRAB ruled nearly 45 years ago:

> Petitioner [the union] contends that the investigation was not conducted in a fair and impartial manner because the evidence presented against him consisted of written statements from employees of another Carrier and a passenger, who did not appear at the hearing. Petitioner urges that the Claimant was improperly denied an opportunity to cross-examine his accusers, and that Rule 18 of the Agreement was violated.
>
> [Text of Rule 18(d) omitted]

27

> No prohibition is found against the use of written statements nor is there any requirement that a witness who submits a statement must be available for cross-examination. Numerous awards of this Board have held that written statements of witnesses not present at an investigation are admissible in the absence of a contractual prohibition. Awards 10596, 9624, 9311, 8504, and others.

*Bro. R.R. Trainmen and Chicago, M., St. P., and P. R.R.*, NRAB Third Div., Award No. 16308, pg. 2 (1968). (*Id.*). *See also Bro. Loco. Eng'rs and Chicago & N.W. Transp. Co.*, NRAB First Div., Award No. 22294, pg. 3 (1973) ("Many awards of this Division have held that written statements of witnesses not present at an investigation are admissible in the absence of contractual provisions."); *American Ry. Supervisors Ass'n and Southern Ry. Co.*, NRAB Fourth Div., Award No. 3490, pg. 5 (1977) (same); *Bro Ry. Carmen and Norfolk & Western Ry. Co.*, NRAB Second Div., Award No. 8665, pgs. 1-2 (1981) (same); *Bro. Loco. Eng'rs and Union Pacific R.R.*, NRAB First Div., Award No. 24400, pg. 5 (1994) (same); *Int'l Bro. Elec. Workers and Norfolk Southern Ry. Co.*, Pub. Law. Bd. No. 6034, Award No. 7, pg. 5 (1999) (same). (*Id.*)

On March 21, 2011, Steven Powers, BMWED's Director of Arbitration, submitted a memorandum to Sherrill Benjamin, OSHA Whistleblower Program Manager, concerning the procedures for disciplinary investigation hearings in the rail industry under the collective bargaining agreements between BMWED and the railroads, including NSR. (*Id.* ¶ 46). BMWED attached a copy of the NSR-BMWED SDR to the Powers Memorandum as "[a]n example of a typical railroad industry discipline rule." (*Id.*). In the Powers Memorandum, BMWED admitted that rail industry arbitration boards routinely have held

28

that the contractual right to a "fair and impartial hearing," such as that found in the NSR-BMWED SDR, does not require a railroad to provide discovery or witness lists in advance of disciplinary hearings.  (*Id.* ¶ 47).  In the Powers Memorandum, BMWED admitted that rail industry arbitration boards routinely have held that the contractual right to a "fair and impartial hearing," such as that found in the NSR-BMWED SDR, does not preclude the receipt of hearsay evidence at disciplinary hearings.  (*Id.* ¶ 48).  In the Powers Memorandum, BMWED admitted that "the courts have also made it clear that the Railway Labor Act does not prescribe due process procedures for conducting a hearing on the railroad property. *Edwards* [*v. St. Louis-San Francisco Railroad Co.*, 361 F.2d 946 (7th Cir. 1966)]; *Brooks v. Chicago, Rock Island and Pacific Railroad Co.*, 177 F.2d 385 (8th Cir. 1994).  Thus, the quantum and quality of due process at the disciplinary hearing is governed by the collective bargaining agreement, that is, that which the union was able to bargain in a forum, collective bargaining, where compromise is inherent."  (*Id.* ¶ 49).

## II.  The Standard of Review

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable

inferences in favor of the party opposing the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704 (7th Cir. 2011); *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). When a case comes before the Court on cross-motions for summary judgment, the Court must look to the burden of proof that each party would bear on an issue at trial and then require that party to go beyond the pleadings and establish through competent evidence a genuine issue of material fact. *See Santella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex*, 477 U.S. at 324).

However, on summary judgment the Court will limits its analysis of the facts to the evidence that is supported by the parties' Local Rule 56.1 statements properly before the Court. *See F.T.C. v. Bay Area Business Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005); *Bordelon v. Chicago Sch. Reform Bd. of Tr.*, 233 F.3d 524, 529 (7th Cir. 2000). When a proposed statement of fact is supported by the record and not adequately controverted by the opposing party, the Court will accept that statement as true. *See Alberio*, 246 F.3d at 933. To adequately dispute a statement of fact, the opposing party must cite to specific support in the record; an unsubstantiated denial or a denial that is mere argument or conjecture is not sufficient to create a genuinely disputed issue of material fact. *See Id.; see also Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady* , 467 F.3d at 1060. District courts are entitled—indeed they are encouraged—to enforce strict compliance with Local Rule 56.1.

*See Judson Atkinson Candies, Inc.*, 529 F.3d at 389 n.2. A "genuine issue" in the context of a motion for summary judgment is not established through a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Factual disputes "are genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmovant." *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 676 (7th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248) (internal quotations and citations omitted). The existence of a materially disputed issue of fact will be sufficient to avoid summary judgment only if the disputed fact is determinative of the outcome under the applicable law. *See Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010); *Tyler v. Runyon*, 70 F.3d 450, 464 (7th Cir. 1995).

## III. Discussion

BMWED petitions this Court for a declaratory judgment and for permanent injunctive relief against NSR for allegedly violating its obligations under the SDR to provide BMWED-represented employees with a "fair and impartial investigation" prior to imposing discipline for workplace misconduct. In particular, BMWED complains that NSR has used expert accident reconstruction repots from engineer Richard Hughes at the on-property disciplinary hearings it conducts without giving the accused employee or BMWED advance notice and without bringing Hughes to the hearing where he could be cross-examined by BMWED. The union alleges that NSR's action in this regard violates

BMWED-members' rights to "contractual due process." According to BMWED, NSR's violations of its members' contractual rights constitutes a violation of Section 2 First of the RLA, 45 U.S.C. § 152 First, which obligates the carrier to maintain agreements with the unions representing its employees. NSR contends that whether its use of the Hughes reports violates the existing collective bargaining agreements is a quintessential RLA "minor dispute." As such, NSR argues that pursuant to Section 3 of the RLA, 45 U.S.C. § 153, and Section 3 Second of the RLA, 45 U.S.C. § 153 Second, the Arbitration Board provisions of the Act, the dispute can only be resolved by RLA arbitrators and that therefore this Court lacks jurisdiction to entertain BMWED's claims and prayer for relief.

Turning to the merits of this dispute, Congress enacted the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, in 1926 to promote the speedy and peaceful resolution of railroad labor disputes. *See Union Pacific Railroad v. Sheehan*, 439 U.S. 89, 94 (1978); *Kulavic v. Chicago & Illinois Midland Ry.*, 1 F.3d 507, 515 (7th Cir. 1993). Despite the intent of the 1926 Act, the process for resolving grievances under the RLA became largely ineffective and was essentially a voluntary one. *See Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 727 (1945). Prior to 1934, parties to an RLA dispute were free at all times to go to court to settle their disputes. *See Id.* at 725. And contrary to the intent of the 1926 Act, each party also had the power, if not the right, to defeat the intended method of settlement of grievances by refusing to join in creating the local Boards of adjustment provided for by the Act. *See Id.*

at 725-726. Congress amended the Railway Labor Act in 1934 to delineate between different types of disputes that may arise under the Act and to make arbitration of minor grievances, by-and-large, binding on the parties and within the exclusive jurisdiction of the newly established Railroad Adjustment Board or special Boards of adjustment voluntarily created by the carriers and the unions. *See Id*. at 727. The RLA thus establishes "a mandatory, exclusive, and comprehensive system" between railcarriers and their employees for settling employment disputes. *Brotherhood of Locomotive Engineers v. Louisville & Nashville R.R.*, 373 U.S. 33, 38 (1963). The Supreme Court "time and again has emphasized and re-emphasized that Congress intended minor grievances of railroad workers to be decided finally by the Railroad Adjustment Board" or by special Boards of adjustment set up by the railways and the unions to resolve such disputes. *See Gunther v. San Diego & A.E.R. Co.*, 382 U.S. 257, 263 (1965). Minor disputes are to be decided finally by railway arbitrators and not by federal courts of limited subject-matter jurisdiction. *See Id.*

A minor dispute in the rail industry is subject, pursuant to Section 3 of the RLA, 45 U.S.C. § 153, to compulsory and binding arbitration before the National Railroad Adjustment Board or before a special Board of adjustment established by the carrier and the union pursuant to Section 3 Second of the RLA, 45 U.S.C. § 153 Second. *See Consolidate Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 303-304 (1987) ("*Conrail*"). Any

such Board has exclusive jurisdiction over minor disputes. *See Id*. Federal courts lack jurisdiction to interpret RLA collective bargaining agreements, *Ryan v. Union Pacific R.R. Co.*, 286 F.3d 456, 460 (7th Cir. 2002), and minor disputes fall within the exclusive jurisdiction of RLA arbitration Boards. This Court, with extremely limited exceptions discussed below, lacks jurisdiction to entertain suits arising out of RLA minor disputes pursuant to the Arbitration Board provisions of the Act.

The RLA does not itself refer to "major" or "minor" disputes. In *Elgin, J. & E. Ry. Co.*, 325 U.S. at 723, the Supreme Court created those terms to distinguish between challenges under RLA Section 2, 45 U.S.C. § 152, and RLA Section 3, 45 U.S.C. § 153. Minor disputes under the RLA are disputes that arise or grow "out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions," RLA Section 3 First (I), 45 U.S.C. § 153 First (I). A minor dispute presupposes the existence of a collective bargaining agreement between the carrier and the union, or at least a situation in which no effort is being exerted to bring about a formal change in the terms of a collective bargaining agreement or to create a new collective bargaining agreement. *See Id.* at 723. A minor dispute relates either to the meaning or appropriate application of a particular provision of a collective bargaining agreement with reference to a specific situation. *See Id.* The claim in a minor dispute is to rights already accrued, not to have new rights created. *See Id.* By contrast, major disputes relate to disputes over the

formation of collective bargaining agreements or efforts to create or alter them. *See Id*. A major dispute arises where there is no collective bargaining agreement governing the relationship between the carrier and the union or where one party seeks to change the terms of a collective bargaining agreement. *See Id.* In a major dispute the issue is not whether an existing agreement controls the controversy; major disputes relate to the acquisition of rights claimed for the future, not to assertions of rights which are alleged to have vested in the past. *See Id.* For major disputes, the RLA requires the parties to undergo a lengthy process of bargaining and mediation prescribed by RLA Sections 5 and 6, 45 U.S.C. §§ 155, 156. "In essence, a major dispute involves the creation of a contract or a change in the terms of an existing contract, while a minor dispute involves the interpretation or application of an existing contract." *Brotherhood of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Employees v. Atchison, Topeka & Santa Fe Ry. Co.*, 847 F.2d 403, 406 (7th Cir. 1988). In the case of uncertainty, as between characterizing a dispute in the railway industry under the RLA as either a major or a minor one, courts "resolve doubts in favor of finding the dispute at issue to be minor." *Id.*

The standard to be applied by federal courts to ascertain whether a dispute is major or minor was established by the Supreme Court in the seminal *Conrail* case, 491 U.S. at 307. "Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor *if the action is arguably justified* by the terms of the parties' collective-

bargaining agreement. Where, in contrast, the employer's claims are *frivolous or obviously insubstantial*, the dispute is major." *Id.* (emphasis supplied). The *Conrail* Court described the standard as imposing on the carrier a "relatively light burden" to establish exclusive arbitral jurisdiction under the RLA. *See Id.* (quoting *Brotherhood of Maintenance of Way EMPLOYEES, Lodge 16 v. Burlington Northern R. Co.*, 802 F.2d 1016, 1022 (8th Cir. 1986)); *see also Brotherhood of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Employees*, 847 F.2d at 406 ("Moreover, the party seeking to establish that a dispute is minor does not face a heavy burden."); *Maine Central R. Co. v. United Transportation Union*, 787 F.2d 780, 783 (1st Cir. 1986) (describing the carrier's burden of establishing that a dispute is minor as "clearly light").

Thus, the Supreme Court held in *Conrail*, 491 U.S. at 310, that "if an employer asserts a claim that the parties' agreement gives the employer the discretion to make a particular change in working conditions without prior negotiations, *and if that claim is arguably justified by the terms of the parties' agreement* (i.e., the claim is neither *obviously insubstantial or frivolous*, nor made in bad faith), the employer may make the change and *the courts must defer to the arbitral jurisdiction of the Board*." (emphasis supplied). The *Conrail* standard has been repeatedly applied by the Seventh Circuit to determine whether an RLA dispute is major, and thus subject to an assertion of federal jurisdiction, or minor, and thus subject to binding and exclusive jurisdiction by RLA Boards of arbitration. *See, e.g., Brotherhood of*

*Maintenance of Way Employees v. Union Pacific R. Co.*, 358 F.3d 453, 456-457 (7th Cir. 2004);

*Brotherhood of Maintenance of Way Employees v. Atchison, Topeka & Santa Fe Ry. Co.*, 138 F.3d

635, 639-640 (7th Cir. 1997); *Burlington Northern R. Co. v. United Transp. Union*, 862 F.2d

1266, 1271 (7th Cir. 1988); *Chicago and North Western Transp. Co. v. Railway Labor Executives*

*Ass'n*, 855 F.2d 1277. 1285 (7th Cir. 1988); *Chicago and North Western Transp. Co. v.*

*International Broth. of Elec. Workers, Local Union No. 214*, 829 F.2d 1424, 1429 (7th Cir. 1987).

    The presumption in favor of finding an RLA dispute to be a minor one is very

strong, and for a union to prevail in rebutting that presumption and establishing that a

dispute is major under the RLA the "evidence must do more than tilt; it must slide into a

heap on one side." *Brotherhood of Maintenance of Way Employees*, 138 F.3d at 643; *see also*

*Brotherhood of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Employees*, 847 F.2d

at 406. "Only disputes that cannot be resolved through interpretation or analysis of a

collective bargaining agreement are considered major." *Burlington Northern R Co. v. United*

*Transp. Union*, 862 F.2d 1266, 1271 (7th Cir. 1988). "[I]f there is any doubt as to whether a

dispute is major or minor a court will construe the dispute to be minor." *Railway Labor*

*Executives Ass'n v. Norfolk & Western Ry. Co.*, 833 F.2d 700, 705 (7th Cir. 1987); *see also*

*Brotherhood of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Employees*, 847 F.2d

at 406 (in the face of uncertainty, courts construe disputes to be minor); *General Committee*

*of Adjustment, United Transp. Union, Western Maryland Ry. Co. v. CSX R.R. Corp.*, 893 F.2d

584, 591 (3d Cir. 1990) ("close cases" are to be treated as giving rise only to minor disputes).

This presumption is necessary to protect the jurisdiction of the National Railroad Adjustment Board or special Boards of adjustment and to promote Congress's purpose and intent in enacting the RLA. *See Chicago and North Western Transp. Co.*, 829 F.2d at 1429. The RLA was designed by Congress for effective and final decisions of grievances which arise daily, and the statutory scheme evidences that Congress intended to foreclose litigation in the federal courts over minor grievances. *See Gunther*, 382 U.S. at 263-264 (quoting *Union Pacific Railroad Company v. Price*, 360 U.S. 601 (1959)). Further, it was Congress's intent in enacting the Adjustment Board provisions of the Act to make minor disputes subject to compulsory arbitration, which is the complete and final means for settling such disputes. *See Id.* (quoting *Locomotive Engineers*, 373 U.S. at 39-40). Congress intended binding arbitration to be "a mandatory, exclusive, and comprehensive system for resolving grievance disputes." *Id.* (quoting *Locomotive Engineers*, 373 U.S. at 38). Congress mandated that disputes over the rights and obligations of railways and their unions under collective bargaining agreements be decided by railway arbitrators, rather than by generalist federal judges, because these arbitrators are intimately familiar with the difficult problems and the wide range of grievances that persistently emerge in the rail industry. *See Id.* at 261. Railway arbitrators are in daily contact with railroad workers and employees, and are peculiarly knowledgeable about the industry's language, custom, and practices. *See Id.* For

these reasons, Congress declared that the decisions of railway arbitrators are "final and binding upon both parties to the dispute," RLA Section 3 First (m), 45 U.S.C. § 153 First (m), and subject to a standard of judicial review that the Supreme Court calls "among the narrowest known to the law." *Union Pacific Railroad*, 439 U.S. at 94.

In deciding whether an employer's actions meet the *Conrail* "arguably justified by the terms of the parties' agreement" standard, the Court is not limited to considering the express provisions of the agreement itself. Rather, the parties' practice, usage, and custom are to be considered in interpreting their agreement. *See Conrail*, 491 U.S. at 311 (quoting *Transportation-Communication Emp. Union v. Union Pac. R. Co.*, 385 U.S. 157, 161 (1966)). In addition, the Court may look to parallel labor agreements, even those involving other parties. *See Transportation-Communication Emp. Union*, 385 U.S. at 161. Further, the Court may consider the "common law of a particular industry" in ascertaining whether an employer's acts are "arguably justified." *Conrail*, 491 U.S. at 312.

At issue in this case is the correct interpretation of the phrase "fair and impartial investigation" contained in the collective bargaining agreement between BMWED and NSR. BMWED argues that NSR has violated this provision of the collective bargaining agreement by not providing advance notice of its use of expert and other third-party witness statements and reports at the disciplinary hearings it conducts for BMWED-represented employees. BMWED further asserts that NSR has violated this provision of

the collective bargaining agreement by not providing it with advance copies of expert and third-party witness statements and reports and by not bringing the authors of these statements and reports to the disciplinary hearings in order to allow BMWED an opportunity to question the authors of these statements and reports.  NSR argues that noting in the SDR between it and BMWED prohibits it from engaging in the conduct that BMWED complains of and that its actions are permissible under the terms of the agreement.

NSR's asserted contractual justification at least meets the *Conrail* "arguably justified" standard, as NSR's asserted rights under the collective bargaining agreement are neither "frivolous" nor "obviously insubstantial."  NSR can carry its "relatively light burden" of establishing that the dispute between it and BMWED is a minor one by demonstrating (1) that nothing in the SDR prohibits it from continuing with its established practice concerning the use of expert reports at its on-property disciplinary hearings; (2) that its conduct in the use of expert reports at its on-property disciplinary hearings is consistent with the established past practices of both itself and BMWED under the SDR; and (3) that its conduct is consistent with the common law of the railroad industry as evidenced by past arbitration awards.  The dispute in this case between BMWED and NSR is one that can be, and actually has been, resolved through interpretation and analysis of the collective bargaining agreements between the parties.  *See Burlington Northern R.R.*, 862 F.2d at 1271.

Such a minor dispute is required to be resolved exclusively and definitively through arbitration under the Adjustment Board provisions of the RLA.

Dissatisfied with the results that it has obtained in prior arbitration awards holding that NSR is not required to provide pre-hearing discovery nor forbidden from using hearsay evidence at its on-property disciplinary hearings, and not having succeeded in obtaining agreement on such obligations through the collective bargaining process, BMWED now asks this Court to intervene in a potential RLA minor dispute, thereby vastly overstepping its jurisdictional authority to essentially rewrite the SDR. BMWED asks this Court to issue permanent injunctive relief imposing pre-hearing notice requirements and document production obligations on NSR (but not on itself), requiring hearing officers to grant continuances during disciplinary hearings, and forbidding NSR (but not itself) from relying on experts who do not meet the standards of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) or *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). These obligations that BMWED asks this Court to impose on NSR by judicial fiat are not found in the language of the SDR, are inconsistent with the past practices of the parties under the SDR and with the common law of the rail industry, and have no basis in the RLA.

BMWED cannot assert that NSR's actions violate any express provision in the SDR. The agreement entitles a BMWED-represented employee to a "fair and impartial investigation" before any adverse disciplinary action is taken against the employee.

41

However, the SDR does not define that phrase or elaborate on what it requires with respect to employee rights or NSR's obligations, beyond the express requirements that the employee is not given less than ten days' advance notice of an investigation hearing, including a description of the precise charge; that a written transcript is made of the evidence submitted at the hearing and a copy of the transcript is provided to BMWED; that the employee may be represented at the hearing by a duly authorized BMWED official; and that the employee may appeal from an adverse disciplinary decision, initially to the highest designated NSR officer and then to an RLA arbitration Board. The SDR, by its express terms, does not provide for any discovery prior to the disciplinary hearings that NSR conducts, it does not mandate advance production of any witness statements or experts reports, and it does not preclude the use of hearsay evidence at the disciplinary hearings. Furthermore, the SDR does not require either party to bring third-party witnesses, including experts, to disciplinary hearings in order that they can be questioned by the party opposite. NSR asserts that is has a right to use expert reports as it has repeatedly done before, and grounds this right in the extensive past practices of both parties under the SDR. In addition, NSR asserts that its use of expert reports is supported by practices elsewhere on NSR property and in the common law of the rail industry.

Both NSR and BMWED have previously interpreted the SDR to allow for the introduction of statements and reports from third-party witnesses, including experts,

without prior notification to the other side and without bringing the authors to the hearings for questioning. The undisputed evidence in this case shows that both parties have consistently interpreted the SDR in this way and have both acted in accordance with that interpretation. In the cases of John Smith, D.L. Bush, and M.S. Queensberry both NSR and BMWED introduced written drug testing reports and physician statements at the employees' disciplinary hearings without previously producing these materials to the other side and without bringing the authors of the reports to the hearings for questioning by the party opposite. In each of these cases NSR's disciplinary action against the employee was upheld by RLA arbitration Boards. In the case of J.D. Parker, an employee of NSR predecessor Southern Railway Company, the carrier used the report of a forensic document examiner without producing the expert at the hearing. On appeal to the arbitration Board BMWED asserted that Parker had not been given a fair and impartial hearing. The Board rejected BMWED's argument and upheld Parker's discipline. In the case of Alfonso Gonzalez, BMWED itself submitted a statement from a physician at Gonzalez's on-property disciplinary hearing without first giving the statement to NSR and without bringing the physician to the hearing for questioning by NSR.

Recently, NSR has used accident reconstruction reports from engineer Richard Hughes and has introduced them into evidence at disciplinary hearings that NSR has held for five BMWED-represented employees. In each case, NSR did not produce the report in

advance of the hearing or bring Hughes to the hearing for questioning. In the first such case, concerning discipline of employee A.D. Gibson, BMWED objected to NSR's failure to produce Hughes for questioning in its appeal from the adverse disciplinary ruling at the on-property disciplinary hearing. The SBA rejected BMWED's argument pertaining to the fact that "Hughes was not available for cross examination," and similarly rejected the argument that Gibson's rights under the SDR had been violated. The SBA ruled that NSR could rely on the Hughes report at the hearing and that the evidence produced at the hearing demonstrated that NSR proved the charge against Gibson by substantial evidence, the evidentiary standard that the railway must carry in order to sustain a disciplinary action taken against one of its employees.

The repeated use of third-party statements and reports by both NSR and BMWED under the SDR, and the Gibson SBA award, shows that NSR is at least "arguably justified" in its interpretation of the SDR based on the parties' established past practices. Furthermore, BMWED's recent attempt to amend the SDR through collective bargaining so as to include an express provision granting BMWED pre-hearing discovery rights further establishes that NSR's position that there currently is no such right under the Agreement is at least "arguable." Finally, the memorandum of Steven Powers, BMWED's Director of Arbitration, confirms that BMWED itself views NSR's position as at least "arguable" because the memorandum admits that the right to a "fair and impartial

hearing" does not require a carrier to provide discovery in advance of disciplinary hearings, does not preclude the use of hearsay evidence at disciplinary hearings, and does not prescribe due process procedures for conducting a hearing on railroad property.

The common law of the railroad industry, as represented in myriad arbitration awards involving NSR, its predecessors, BMWED, and other railroads, establishes that there is no right to pre-hearing discovery absent express contractual language explicitly creating such a right and permits any party to present and rely upon hearsay evidence at disciplinary hearings. The common law in the rail industry provides further support for the contention that NSR's interpretation of its rights and obligations under the SDR is at least "arguable."

Courts must find a dispute to be a minor one unless the carrier's claims of contractual justification are so frivolous or obviously insubstantial that it appears that the carrier is attempting to circumvent the RLA's major dispute resolution procedures contained in Sections 5 and 6 of the Act, 45 U.S.C. §§ 155, 156. . *See Chicago & North Western Transp. Co. v. Railway Labor Executives Ass'n*, 855 F.2d 1277, 1285 (7th Cir. 1988). NSR's interpretation of its rights and obligations under the SDR, including its use of expert reports and hearsay evidence, is not frivolous or obviously insubstantial so as to indicate that NSR is attempting to change the governing agreements between itself and BMWED without first going through the RLA major dispute resolution procedures. It is BMWED

that is trying to change the governing agreements between the parties by having this Court impose new obligations under the SDR on NSR without having to go through the mandatory RLA bargaining process of Sections 5 and 6 of the RLA, 45 U.S.C. §§ 155, 156. The Court concludes that the present dispute between the parties is a minor one within the meaning of the RLA and that therefore its resolution is entrusted to the sound discretion of RLA arbitration Boards, which exercise exclusive and binding jurisdiction to resolve such disputes pursuant to the Arbitration Board provisions of the Act. *See* 45 U.S.C. § 153 and 45 U.S.C. § 153 Second.

BMWED asserts that this "extraordinary case is anything but a 'minor dispute.'" In a passing footnote, BMWED simply asserts that it believes that the dispute is not a minor one. That is the extent of its "analysis" of this dispositive issue. The union never cites *Conrail* or the lower court cases that have applied its governing standard. Nor does it acknowledge the heavy burden that it must carry under Supreme Court and Seventh Circuit precedents, which it does not even acknowledge, in order to establish that NSR's assertion of its contractual rights is "frivolous" or "obviously insubstantial." BMWED ignores the past practices of the parties under the SDR with respect to the use of hearsay expert reports and the absence of any obligation in that agreement to provide for pre-hearing discovery. It likewise ignores the decades of arbitral precedent under that agreement and throughout the railroad industry. Rather, the union attempts to justify its

extraordinary and unprecedented request for relief with scurrilous attacks on its opponent and factually baseless assertions that are not supported by the record.

It is not difficult to understand why BMWED wishes the dispute at issue not to be characterized as a minor one. What is confounding is BMWED's utter disregard for the decades of law prescribing the standard for determining when a dispute is minor and therefore falls within the exclusive jurisdiction of RLA arbitrators. BMWED does not even make an attempt to demonstrate that this dispute is not a minor one and that therefore this Court has jurisdiction over it. BMWED's behavior is like that of an ostrich, burring its head in the sands of long-established principles of law. The ostrich may be a noble animal, but it is not a proper model for advocating one's position on summary judgment. *See Gonzalez-Servin v. Ford Motor Co.*, 662 F.3d 931, 934 (7th Cir. 2011). "The ostrich-like tactic of pretending that potentially dispositive authority against a litigant's contention does not exist is as unprofessional as it is pointless." *See Id.* (quoting *Hill v. Norfolk and Western Ry.*, 814 F.2d 1192, 1198 (7th Cir. 1987)).

The cases cited by BMWED in its Motion for Summary Judgment to support its argument that "federal courts have jurisdiction to issue injunctions to effectuate the purposes of the RLA" are unavailing under the circumstances of the present case. In every case in which a court has issued injunctive relief in an RLA minor dispute the court was acting to effectuate and reinforce the exclusive and binding jurisdiction of RLA arbitration

Boards to resolve minor disputes or was acting to preserve the *status quo* without reaching a decision on the merits of the underlying dispute so that the issue could eventually be resolved by RLA arbitration Boards. Courts that have issued injunctions in RLA minor dispute cases have done so in order to enable RLA arbitration Boards to provide adequate relief based on the Board's determination of the rights and obligations of the parties under the relevant agreement. If this Court were to grant BMWED's requested relief in this case it would work the opposite result—the Court would be overstepping its jurisdictional authority by deciding the dispute on its merits and would effectively be circumventing the explicit mandates of the Railway Labor Act, emasculating the RLA arbitration Boards by rendering them incapable of exercising their proper authority to finally and exclusively resolve RLA minor disputes pursuant to the Arbitration Board provisions of the Act. It is Congress's intent, as manifested in the Railway Labor Act, that the dispute in the present case between NSR and BMWED be resolved by railway arbitrators and not by a federal court.

In *Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad Co.*, 363 U.S. 528 (1960), upon which BMWED relies in support of its Motion for Summary Judgment, the federal district court issued an injunction requiring the railroad to maintain the *status quo* and not to relocate disputed work during the resolution of an RLA minor dispute as a condition of granting an anti-strike injunction requested by the railroad. The Fifth Circuit

reversed the district court, 266 F.2d 335, and the Supreme Court reversed the Fifth Circuit,

holding that the district court acted within its equitable authority to issue the injunction

with the *status quo* conditions. *See Id*. at 531. However, the Court held that the district

court's authority to require the railroad to preserve the *status quo* was predicated solely on

the issuance of the anti-strike injunction requested by the railway. *See Id.* at 531 n.3. The

Court held that the union was not entitled to a *status quo* order independent of a suit by the

railroad for equitable relief. *See Id.* The Court stated that "[t]his case does not involve

independent relief for the union." *See Id.*

      The Supreme Court held that the *status quo* condition did not constitute a decision

on the merits of the underlying dispute, which would have impermissibly encroached upon

the exclusive jurisdiction of RLA arbitrators to finally decide RLA minor disputes. *See Id*.

at 532-533. Instead of usurping the exclusive jurisdiction of the Board, the Court held that

the district court's *status quo* condition served to protect the exclusive jurisdiction of the

Board. *See Id*. at 534. The Court stated that "[i]t is not difficult to perceive how the

conditions imposed in this case could be deemed to serve to protect the jurisdiction of the

Board." *See Id.* The Court held that the nature of the dispute, which involved not only

rates of pay or job assignments but the discharge of employees from long-held positions

and dislocation from their homes, was such that the slow nature of the Board might make

it impossible for the Board to make a timely decision. *See Id.* "If this be so, the action of the

district judge, rather than defeating the Board's jurisdiction, would operate to preserve the jurisdiction by preventing injury so irreparable that a decision of the Board in the unions' favor would be but an empty victory." *See Id*. The Supreme Court subsequently ruled in *Conrail*, 491 U.S. at 304, that "this Court has never recognized a general statutory obligation on the part of an employer to maintain the *status quo* pending the Board's decision." Thus, *Brotherhood of Locomotive Engineers* stands for the narrow proposition that a district court may enter an injunction with *status quo* conditions where to do so operates to preserve the exclusive jurisdiction of the arbitral Board to resolve RLA minor disputes when the injunction is requested by the railway to enjoin a strike, where the court in no way passes on the merits of the underlying dispute, and where the issuing court does not interfere with the arbitral Board's consideration of the matter.

In *Local Lodge No. 1266 Intern. Ass'n of Machinists v. Panoramic Corp.*, 668 F.2d 276 (7th Cir. 1981) (a case governed by the Labor Management Relations Act, and not the RLA), another case on which BMWED relies, the court affirmed the district court's issuance of a *status quo* injunction preventing the employer from completing a sale of corporate assets pending a decision by an arbitrator of the union's claim that the sale violated the parties' collective bargaining agreement. The court held that such a *status quo* injunction may be issued when an employer's challenged actions, if undertaken during the course of grievance-arbitration proceedings, would make arbitration a futile exercise. *See Id.* at 283.

The court ruled that the failure to issue an injunction under the circumstances would have resulted in an outright frustration of the arbitral process. *See Id.* The injunction was necessary to prevent the arbitration "from being rendered a meaningless ritual." *Id.* But the court cautioned that the district court's inquiry in granting such an injunction was not "to amount to a judicial preview of the arbitral issue." *Id.* at 285. Citing *Brotherhood of Locomotive Engineers*, the Seventh Circuit stated that "the type of injunction issued in the instant case not only does not interfere with the arbitrator's function, but, in fact, honors and protects the arbitrator's jurisdiction by preserving an effective arbitral remedy for the alleged breach of contract." *Id.* Thus, the Seventh Circuit endorsed the use of a *status quo* injunction where the injunction serves to protect the integrity of RLA arbitration Boards to exclusively resolve minor disputes and where the court does not pass on the merits of the underlying dispute between the parties, instead leaving the resolution of the dispute to RLA arbitrators.

In a case BMWED relies on that actually involved an RLA minor dispute, *Brotherhood of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Employees*, 847 F.2d 403, the Seventh Circuit addressed the limited circumstances in which a court may enter a *status quo* injunction. In affirming the district court's denial of the union's request for an injunction, the court noted that the union did not seek temporary relief pending an NRAB decision, but instead asked the court to address the dispute on the merits. *See Id.* at 405 n.1. The

court ruled that because the dispute between the parties was a minor one it had to be resolved by the NRAB pursuant to the RLA's Arbitration Board provisions. *See Id.* Because the union failed to allege that the RLA arbitration process could not properly resolve the matter, the Seventh Circuit found "no basis for asserting jurisdiction over the subject matter of [the] dispute." *Id.* at 412. BMWED mischaracterizes the Seventh Circuit's decision in this case in its brief. BMWED claims that the district court granted the union's request for an injunction and that the Seventh Circuit affirmed that ruling. This gets the case exactly backwards—in fact, the district court dismissed the complaint, *Id.* at 404, and the Seventh Circuit affirmed. *See Id.* at 412. The court affirmed the dismissal because the union had asked the district court to decide the dispute on the merits, rather than seek a *status quo* injunction pending RLA arbitration, which is exactly what BMWED is doing in the present case—asking this Court to resolve an RLA minor dispute on the merits rather than seeking a *status quo* injunction in aid of preserving exclusive RLA arbitration.

*Bro. Ry. Carmen Div. v. Green Bay & W. Ry.*, 801 F. Supp. 231 (E.D. Wisc. 1992), the final case cited by BMWED in its Motion for Summary Judgment, is in keeping with this line of authority. In that case, the court ordered the parties to engage in expedited arbitration of their dispute over an employee's dismissal in order to obtain an arbitral resolution in advance of a decision by the Interstate Commerce Commission approving the sale of the carrier's rail line on which the employee had worked because the court

concluded that the only way in which arbitration would have any effect on the dispute was if it occurred before the anticipated sale date. *See Id*. at 237. The court rejected the union's request that the carrier be ordered to reinstate the terminated employee pending arbitration because such an order would impermissibly constitute a decision on the merits of the parties' minor dispute and thus encroach upon and interfere with the exclusive jurisdiction of RLA arbitrators to finally resolve the dispute. *See Id*. at 238. The court held that its "jurisdiction over this matter only extends far enough to order the parties to submit to expedited arbitration. Whether or not [the employee] was terminated as a result of his union activities or because he was a bad employee is something that must be decided by an arbitrator, pursuant to the bargaining agreement." *Id*.

The cases cited by BMWED in its responsive brief are equally unavailing. None of the decisions cited by BMWED are of any relevance to the claims in this case and do not support BMWED's contention that "[t]he RLA is a source of equitable jurisdiction by implication." In *Brotherhood of R.R. Trainmen v. Chicago R. & I.R. Co.*, the Supreme Court held that federal courts have the authority to enjoin a union from striking over an RLA minor dispute. In *Brotherhood of R.R. Trainmen v. Howard*, 343 U.S. 768 (1952), the Supreme Court upheld an injunction to prevent the enforcement of an agreement that discriminated against Black employees. In *Virginian Ry. Co. v. System Federation No. 40*, 300 U.S. 515 (1937), the Supreme Court affirmed the issuance of an injunction to compel a railroad to

recognize and bargain with its workers' authorized union. In none of these cases did the Court uphold an injunction in an RLA minor dispute where the injunction would resolve the dispute on the merits or not be in aid of exclusive RLA arbitration. Furthermore, none of these cases involved facts relevant to the dispute at issue in this case. Namely, whether a railway can introduce evidence at disciplinary hearings without first disclosing the evidence to the union and whether hearsay evidence is admissible at disciplinary hearings. The cited cases did not involve allegations of fraud by the railways, and have no relevance to the issues in this case.

Equally unpersuasive are the "federal common law" decisions that BMWED cites in its responsive brief. *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448 (1957), concerned the enforcement of an obligation to arbitrate grievances under Section 301 of the Labor Management Relations Act, not the RLA. BMWED misleadingly quotes from *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 489 U.S. 426, 432 (1989), omitting the phrase "developed under the NRLA" from the quote, "We have observed in the past that carefully drawn analogies from federal common labor law developed under the NLRA may be helpful in deciding cases under the RLA." In that case the Supreme Court looked to NLRA precedents for guidance in determining the reinstatement rights of striking union members under the RLA. BMWED cites no analogies—much less carefully drawn ones—from NLRA decisions in support of its claims here. *Doyle v. Southeastern Penn.*

*Transp. Auth.*, 398 Fed.Appx. 779 (3rd Cir. 2010) involved the issue of whether an employee waived his right to enforce a prior arbitration award. At issue in *Local 107 Office & Prof. Employees Int'l Union v. Offshore Logistics*, 380 F.3d 832 (5th Cir. 2004), was whether an alleged agreement to amend a collective bargaining agreement was enforceable when the parties had failed to go through the formal bargaining procedures of Sections 5 and 6 of the RLA. *Bro. of Locomotive Engineers v. Springfield Term Ry. Co.*, 210 F.3d 18 (1st Cir. 2000) concerned the issue of whether the district court had properly enjoined a company controlled by a railroad from doing switching work historically preformed by the railroad's unions. In *Sisco v. Consolidated Rail Corp.*, 732 F.2d 1188 (3rd Cir. 1984) the court had to resolve the issue of the proper statute of limitations to apply to a claim against a union for breach of the duty of fair representation. BMWED claims that *Kaschaka v. Consolidated Rail Corp.*, 707 F.2d 902 (6th Cir. 1983) is "instructive."

But that decision is irrelevant to the instant dispute. At issue in that case was whether a rail employee could maintain a breach of contract claim against his employer in federal court when he had been prevented from arbitrating the dispute under the RLA because his union breached its duty of fairly representing him. All of these cases cited by BMWED are inapposite to its claims in this case. None concern pre-disciplinary hearing discovery or the use of hearsay evidence at disciplinary hearings, and none concern allegation of fraud by the carrier in connection with the disciplinary hearings it conducts

for union-represented employees.  Equally inapposite is the farrago of cases cited by BMWED to show that courts do not tolerate fraud or perjury.  None of the cases cited involved the authority of a federal court to intervene in, and essentially rewrite, an RLA carrier's disciplinary procedures concluded by agreement in violation of the exclusive jurisdiction of RLA arbitration Boards to finally and conclusively decide RLA minor disputes.

Here BMWED does not seek the entry of a *status quo* injunction in order to preserve the jurisdiction of an RLA arbitration Board to provide adequate relief based on the Board's determination of the rights and obligations of the parties under the SDR.  Indeed, a special Board of adjustment has already considered the issues now raised by BMWED when it decided the Gibson case and rejected BMWED's position outright.  BMWED is likewise not acting to compel NSR to participate in expedited arbitration because of any alleged irreparable injury that would be caused by a delay in getting an RLA Board to arbitrate a claim in due time.  BMWED simply is not seeking relief in aid of arbitration; it is seeking relief in circumvention of arbitration—which in turn is relief in circumvention of the Arbitration Board provisions of the Railway Labor Act.  What BMWED is doing is trying to avoid arbitration of these issues because it is disappointed with the results of the arbitral decisions it and its fellow unions have thus far received.  BMWED, rather than seeking to protect and preserve the final and binding exclusive arbitral process that Congress has

crafted for the resolution of such disputes is essentially asking this Court to ignore Congress's carefully designed arbitral scheme embodied in the Arbitration Board provisions of the RLA. BMWED is seeking from this Court exactly the relief that the decisions it cites say this Court is without jurisdiction to provide: a decision on the merits of the dispute over NSR's rights and obligations under the SDR with respect to pre-hearing discovery and the submission and receipt of hearsay evidence in investigation hearings.

BMWED has tried to obtain this relief through arbitration and collective bargaining without any success, so now it asks this Court to grant it. If the Court were to do what BMWED requests—and essentially rewrite the governing agreements between it and NSR—the Court would be grossly overstepping its authority. Congress has limited the extent to which a federal court can entertain suits arising out of RLA minor disputes by promulgating the Arbitration Board provisions of the Act, and the Supreme Court has placed further restrictions on the judiciary's permissible involvement in resolving such disputes. This Court is bound to follow Congress's clear instructions as manifested in the Act that it passed, as well as the limitations placed on this Court's authority by the Supreme Court's decisions construing the Act. Entertaining this suit or granting BMWED's prayer for relief would be a direct violation of Congress's commands embodied in the Railway Labor Act. Furthermore, this Court must defer to the decisions of superior courts, which have uniformly commanded that RLA minor disputes are to be exclusively and

finally resolved by RLA arbitration Boards.  This case presents a quintessential RLA minor dispute, and BMWED is not seeking an injunction in aid of arbitration but rather is asking the Court to resolve the minor dispute on the merits.  This Court lacks jurisdiction to grant BMWED's requested relief.

## IV. Conclusion

For the reasons expressed above, the dispute between BMWED and NSR is a Railway Labor Act minor dispute and therefore it is subject to the binding and exclusive jurisdiction of a Railway Labor Act arbitration Board pursuant to Section 3 of the Act, 45 U.S.C. § 153, and Section 3 Second of the Act, 45 U.S.C. § 153 Second. This Court lacks jurisdiction to resolve this dispute under the Act, to entertain the claims of Brotherhood of Maintenance of Way EMPLOYEES Division/IBT, or to grant the union the relief it requests. If the union wishes to pursue the claims it has advanced in this Court it must do so before a Railway Labor Act arbitration Board, and if the union cannot obtain its desired results through arbitration it must try to collectively bargain with the carrier for them. Brotherhood of Maintenance of Way Employes Division/IBT's Motion for Summary Judgment is accordingly denied. The claims of Brotherhood of Maintenance of Way EMPLOYEES Division/IBT must be dismissed for want of jurisdiction. Norfolk Southern Railway Company's Motion for Summary Judgment is therefore granted.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 25, 2012